UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
JORGE GANDIA ORTEGA,                                             :

                      Petitioner,        :  09 Civ. 608 (LTS) (GWG)
                                     02 Cr. 348

        -v.-                                             :
                                     REPORT AND
UNITED STATES OF AMERICA,                                        :  RECOMMENDATION

                     Respondent.       :
------------------------------------------------------------------------x

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

Jorge Gandia Ortega was convicted by a jury on February 10, 2004, of one count of conspiracy to distribute and possess with the intent to distribute more than five kilograms of cocaine, and of one count of distribution and possession with the intent to distribute approximately twenty kilograms of cocaine.  See 21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(A), 846.  On June 2, 2005, the District Court sentenced him principally to 360 months in prison.  The United States Court of Appeals for the Second Circuit affirmed the judgment of conviction on September 28, 2007.  Ortega, who is currently in prison serving his sentence, has petitioned this Court pro se under 28 U.S.C. § 2255 to vacate, set aside, or correct his sentence.

For the reasons stated below, all of Ortega's claims should be denied with the exception of Ortega's claim that he received ineffective assistance of counsel from Robert Koppelman with respect to his decision to go to trial rather than to plead guilty.  As to that claim, the Court is by separate Order appointing counsel for purposes of presenting evidence at a testimonial hearing.

I. <u>BACKGROUND</u>

Ortega's recounting of events has changed somewhat during the course of briefing. Except as otherwise noted, the following facts are either conceded or not contradicted by Ortega based on his most recently-filed declaration.

A.    <u>Pretrial Events</u>

On January 7, 2003, Ortega and his co-defendant, Claudio Parra, were charged in a two-count indictment.  <u>See</u> Indictment, filed Jan. 7, 2003 (Docket # 18 in 02 Cr. 348) ("Indictment"). Count One charged Ortega with conspiracy to distribute and possess with the intent to distribute five kilograms or more of cocaine, which was alleged to have occurred between 1998 and August 8, 2000.  <u>Id.</u> ¶¶ 1-2.  Count Two charged Ortega with a substantive count of distribution or possession with intent to distribute approximately twenty kilograms of cocaine.  <u>Id.</u> ¶ 4.

Ortega was arraigned on January 17, 2003, at which time he was represented by appointed counsel Lisa Scolari.  <u>See</u> Docket Sheet Entry: Arraignment as to Jorge Gandia Ortega Held, dated Jan. 17, 2003 (02 Cr. 348).  On February 3, 2003, Larry Bronson filed a notice of appearance on behalf of Ortega.  <u>See</u> Appearance, filed Feb. 3, 2003 (Docket # 21 in 02 Cr. 348). In March 2003, Ortega discussed his case with Bronson.  <u>See</u> Declaration of Jorge Gandia Ortega, dated Aug. 25, 2009 (annexed as Ex. F to Supplemental Exhibits in Support of Section 2255 Motion, filed Sept. 16, 2009 (Docket # 93 in 02 Cr. 348) ("Pet. Supp. Ex.")) ("Ortega Decl.") ¶ 3.  Bronson told Ortega that "the government had only one witness, no Title-III evidence, and no physical evidence to use against [Ortega]."  <u>Id.</u>  Bronson said that, based upon a "thorough review" of the facts of the case, he thought it would be "foolish" of Ortega to plead guilty and receive a ten-year sentence, given that he "could win at trial and go home."  <u>Id.</u> Ortega states that Bronson informed him that if he pled guilty, he was facing 121-151 months

and that if he went to trial and lost, he was facing 168-210 months.  Id. ¶ 9.  Bronson told him

that he was risking only an additional 17 months by going to trial rather than pleading guilty.  Id.

¶¶ 4, 9.

On March 10, 2003, Bronson wrote a letter to petitioner's wife, Evelyn Guadarrama,

regarding Guadarrama's "family's insistence" that Ortega "plead[] guilty" and setting out the

difference in the prison sentence that Ortega would face if he pled guilty rather than going to

trial.  See Letter from Larry Bronson to Eveyln Guadarrama, dated Mar. 10, 2003 (annexed as

Ex. E to Motion to Vacate Sentence Pursuant to 28 U.S.C. § 2255 (filed Jan. 22, 2009) (Docket

# 1) ("Pet. Mot.")) ("Bronson Ltr.").  The letter was consistent with what Bronson had told

Ortega directly.  Bronson wrote that if Ortega "were to plead guilty he [wa]s facing a mandatory

minimum sentence of ten years to forty years," and if Ortega was to lose at trial he would face "a

minimum of one hundred sixty eight months and a maximum sentence of two hundred and ten

months" under the sentencing guidelines.  Id. at 1.  Bronson then calculated the "difference

between th[e] sentence" if Ortega pled guilty and if he went to trial as "one twenty one and one

fifty one subtracted from one hundred and sixty eight months."  Id.  So, Bronson stated, it was

"possible" that Ortega "would only receive an additional seventeen months if he were to go to

trial and lose, if we are successful he will receive no time in jail."  Id.  Bronson concluded the

letter by giving Guadarrama his opinion of Ortega's case.  Id. at 1-2.  He stated that the

Government's case against Ortega was "based solely on the testimony of an informant[,] Brian

Gandy," and because there was "very little difference between the plea agreement and the trial[,]

it [wa]s most important for [Ortega] to seriously consider going to trial."  Id. at 1.  Bronson felt

the decision to go to trial was not a "very risky proposition" as they had a "very good chance of

discrediting the informer and [because] there [we]re no wiretaps of" Ortega.  Id.  Finally,

Bronson informed Guadarrama that she should send him $5,000 that week.  Id. at 2.  Ortega was

informed of some of the contents of the March 10, 2003 letter by his wife.  Ortega Decl. ¶ 5.

   In "May or June of 2003," a government witness, Hamlet Gonzalez, informed Ortega that

he, Eddy Rosario, and possibly others would be called to testify against Ortega.  Id. ¶ 7.  Ortega

informed Bronson of this conversation.  Id. ¶ 8.  According to Ortega, Bronson "brushed aside

[his] concerns that the government had sufficient evidence against [him] for a conviction if [he]

went to trial."  Id. ¶ 9.  Ortega did not tell Bronson that he wished to plead guilty, but only that

he was "seriously considering pleading guilty."  Id. ¶ 8.

   Some time after his conversation with Gonzalez, but in a time period identified by

Gonzalez as "April or May 2003," Koppelman came to see Ortega, informed him that he was an

associate of Bronson's, and would be assisting Bronson in representing Ortega.  Id. ¶ 11.  After

that meeting with Koppelman, however, Ortega never saw Bronson again.  Id.  The docket sheet

reflects that Koppelman first appeared at a pre-trial conference in the case on May 15, 2003, see

May 15, 2003 Transcript (annexed as Ex. C to Appendix of Declarations and Exhibits in Support

of the United States of America's Opposition to Defendant Jorge Gandia Ortega's Motion

Pursuant to 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct his Sentence, filed July 29, 2009

(Docket # 89 in 02 Cr. 348) ("Resp. App'x")), and was the sole attorney to make appearances for

Ortega after that date, including at Ortega's trial.

   Koppelman brought discovery materials to his initial meeting with Ortega.  Ortega Decl.

¶ 12.  He and Ortega discussed "the nature and status of the government's case" against Ortega.

Id.  Koppelman "insisted that Gonzalez was the only witness the government had to use against

[Ortega]."  Id.  He advised Ortega to go to trial.  Id.

   There is no evidence that any plea offer had ever been made by the Government during

the period of these conversations with Bronson and Koppelman.

Ortega asserts that in October or November 2003, the Government made a plea offer of eleven years.  Id. ¶ 13.  At the same meeting where that offer was made, Ortega asserts that "Koppelman debated the strength of their case with the government attorneys."  Id.  In private, Koppelman informed Ortega that "the government had a weak case, and advised [him] to take [his] case to trial."  Id.  Ortega does not address what the Government stated at that session with respect to a plea offer, except that it was for "eleven years."  Id.

The Government, however, has submitted evidence regarding what transpired at a December 9, 2003 meeting.  Handwritten notes by the Assistant United States Attorney assigned to the case, Joon H. Kim, and dated December 9, 2003, indicate the Government's position at that time on Ortega's sentence if he were to plead guilty versus go to trial.  See Government Notes, dated Dec. 9, 2003 (annexed as Ex. E to Resp. App'x) ("Gov't Notes"); Declaration of Joon H. Kim, dated July 28, 2009 (annexed to Resp. App'x) ("Kim Decl.") ¶ 5.  Kim states in a sworn declaration that his review of the notes shows that he informed Ortega of the sentencing range he would face under the plea offer and the sentence he would face at trial.  Kim Decl. ¶ 4.  The notes state that "even under [a] very conservative estimate" Ortega's "best case scenario" was that his Guidelines sentence would be 360 months to life if he went to trial.  Id. ¶ 5; Gov't Notes at 1.  If he pled guilty, he faced 135-168 months.  Gov't Notes at 1.  The notes state that Ortega's deadline to accept this plea offer was December 12, 2003.  Id.   In a later internal e-mail, Kim stated that he had conducted a reverse proffer with Ortega in December 2003.  See Email from Joon Kim to Richard Daddario, dated Jan. 21, 2004 (annexed as Ex. G to Resp. App'x) ("Jan. 21 Email").  At the reverse proffer, the email stated that Kim had also informed Ortega that his "post-conviction guidelines range would be way above 20 years."  Id. (internal

punctuation omitted).[1]

Ortega states that in December 2003, not long after the meeting, Koppelman informed him that the Government had a new plea offer of thirteen years.  Ortega Decl. ¶ 14.[2]  Ortega told Koppelman that he wanted to accept the offer, but Koppelman again told Ortega that the Government's case was very weak and advised him to go to trial.  Id.  Ortega states that after consulting with his family, he intended to plead guilty.  Id. ¶ 15.  However, based on Koppelman's "insistence that the choice [Ortega] had was between having a very good chance to win and go free[,] or, in the worst case, doing a short time (17 months) more than [he] would had to do by accepting the government's thirteen year plea if [he] lost," id. ¶ 16, Ortega ultimately did not accept the plea offer.

On January 15, 2004, a pre-trial conference was held at which both Ortega and Parra were present.  See January 15, 2004 Transcript (annexed as Ex. L to Resp. App'x) ("Jan. 15 Tr.").  At the conference, the government sought to have Parra's bail revoked.  Id. at 70.  In response to a question from the court, the Government stated that for each count of the

---

[1]  On December 9, 2003, the Government requested an extension of its deadline to make motions in limine and to disclose evidence admissible under Fed. R. Evid. 404(b) against Ortega.  See Letter from Joon H. Kim/Stephen A. Miller to the Honorable Peter K. Leisure, dated Dec. 9, 2003 (annexed as Ex. D to Resp. App'x).  The Government noted that it was "presently engaged in fruitful plea negotiations" with Ortega "that may obviate the need for any such filings."  Id.  On December 17, 2003, the Government requested another extension of the deadline to make motions in limine and to disclose evidence admissible under Fed. R. Evid. 404(b) against Ortega.  See Letter from Joon H. Kim/Stephen A. Miller to the Honorable Peter K. Leisure, dated Dec. 17, 2003 (annexed as Ex. F to Resp. App'x).  The letter also stated, however, that the need for any such filings may be obviated as the Government and Ortega "continue to pursue fruitful plea negotiations."  Id.

[2]  Ortega's declaration of August 2009, submitted as part of the briefing on the petition, is partially contradicted by his original petition.  In his original papers, Ortega claimed that the government had initially offered a plea of thirteen years, followed shortly thereafter by an offer of eleven years.  See Pet. Mot. at 12 ¶ 30.  He did not indicate when these offers were made.

indictment "the maximum is life and there is a mandatory minimum of 10 years." Id. at 71.  The

Government also stated that it had a "strong case that's gotten stronger over time" against Parra.

Id. at 73.  Among the evidence that the Government highlighted was surveillance by law

enforcement, testimony of two cooperators, and physical evidence seized from Parra's home, as

well as a home he was seen picking Ortega up from.  See id. at 73-74.  The Government

calculated Parra's sentence, presumably based on a criminal history category of I, as "20 year[s]

. . . on the low end if convicted" and potentially 292-365 months based on the Government's

claim that Parra had engaged in obstruction because of a false affidavit he submitted.  Id. at 75-

76.  There was no discussion of a guidelines calculation for Ortega, who had a different criminal

history.

In January 2004, the Government learned that Ortega had a prior conviction for a drug

felony.  See Jan. 21 Email.[3]  In an email dated January 21, 2004, AUSA Kim sought approval

from his supervisor to extend a plea offer to Ortega of 235 to 293 months imprisonment.  Id.

This proposed offer was based on a drug quantity of 150 kg of cocaine and assumed a criminal

history category of IV.  Id.  Kim does not remember if the offer was extended to Ortega.  Kim

Decl. ¶ 6.  On January 22, 2004, the Government filed a prior felony information.  See Prior

Felony Information, filed Jan. 22, 2004 (Docket # 46 in 02 Cr. 348).

Ortega claims that "[u]ntil the day of trial, [he] did not know that he was going to trial

instead of pleading guilty."  Pet. Mot. at 16 ¶ 48.  On the first day of trial, January 26, 2004,

Ortega states that he informed Koppelman that he did not want to go to trial and instead wished

---

[3]  The effect of the prior felony, if presented to the court in an information, would be to make the mandatory minimum sentence 20 years (i.e., 240 months) rather than 10 years.  See 21 U.S.C. §§ 841(b)(1)(A), 851.

to plead guilty.  See Ortega Decl. ¶ 17.  At that point, Koppelman "conferred with the government's attorneys, and informed [Ortega] that [he] could plead guilty, but that [he] would be . . . exposed to a potential sentence of life imprisonment" due to his prior convictions.  Id.

B.    Evidence at Trial

Judge Peter K. Leisure presided over Ortega's trial, which took place in January and February 2004.  See Trial Transcripts, filed Mar. 24, 2004 (Docket ## 56, 57 in 02 Cr. 348) ("Tr.").  The evidence at trial is not directly relevant to this petition and thus is only summarized briefly.  Over the course of a nine-day trial, the Government introduced evidence of Ortega and Parra's involvement in drug trafficking in the form of documents, drug paraphernalia seized from certain residences and cars, testimony of law enforcement officers and defendants' accomplices, and 20 kilograms of seized cocaine.

Eddy Rosario, one of Ortega's accomplices, testified that around 1999 he began to work with Ortega in a cocaine-distribution business in which they imported cocaine from Puerto Rico through couriers, diluted the cocaine's purity, and repackaged and sold it.  (Tr. 615; Rosario: Tr. 641-47, 664).  Hamlet Gonzalez, the other cooperating witness who testified at trial, began working for Rosario and Ortega around October 1999.  (Gonzalez: Tr. 317, 332-33).  Individuals brought six kilos of cocaine to New York "taped to their bodies" every two weeks; Gonzalez then worked with Ortega to prepare it to be brought to North Carolina.  (Gonzalez: Tr. 334-46).  Gonzalez would give proceeds from the sales of the cocaine to Rosario and Ortega.  (Gonzalez: Tr. 338; Rosario: Tr. 661-62).  Gonzalez traveled to Puerto Rico with Ortega or met him there to bring money to purchase drugs. (Gonzalez: Tr. 338-39; Rosario: Tr. 664-65).  In June or July 2000, Rosario hired Parra to help with the drug business.  (Gonzalez: Tr. 342).  Parra would pick up the couriers from the airport and bring them, with the cocaine, to Gonzalez's apartment.

8

(Gonzalez: Tr. 342-43).

On August 8, 2000, Parra brought 20 kilograms of cocaine to Gonzalez's apartment on Matthews Avenue in the Bronx.  (Gonzalez: Tr. 344-45).  Ortega and Gonzalez diluted, packaged and placed the cocaine into a suitcase at the apartment (Gonzalez: Tr. 348-49), after which Parra picked them up in his car.  (Gonzalez: Tr. 351-52).  Ortega placed the packaging from the cocaine in the trunk of Parra's car, as Ortega had said "it would be a good idea for [Parra] to get rid of them far away from the apartment."  (Gonzalez: Tr. 352; Maher: Tr. 51; Mojica: Tr. 205).  Parra drove to a parking garage on Webster Avenue in the Bronx, where Ortega and Gonzalez exited Parra's vehicle and entered a black Lexus sport utility vehicle. (Mojica: Tr. 207-08).  At that point, law enforcement officers arrested Gonzalez, Ortega and Parra (Maher: Tr. 44-45; 52-53; Gonzalez: Tr. 353-54).  When law enforcement officers searched Gonzalez's Matthews Avenue apartment that evening, they found a suitcase containing approximately 20 kilograms of cocaine.  (Maher: Tr. 60; Murphy: Tr. 145-46; Hall: Tr. 577-79).

Neither Ortega nor Parra testified at trial.

C.     The Jury Verdict and Sentencing

On February 10, 2004, the jury returned a verdict finding Ortega guilty of conspiracy to distribute and possess with the intent to distribute more than five kilograms of cocaine, and of the substantive count of distribution or possession with intent to distribute.  See Indictment; Verdict Sheet, dated Feb. 10, 2004 (annexed to Indictment).  On May 24, 2004, Judge Leisure held a Fatico hearing before sentencing to determine issues of fact regarding sentencing: in particular, the total quantity of cocaine involved.  At the hearing, Rosario provided additional testimony about his cocaine transactions with Ortega.  See Hearing Transcript, filed June 1, 2004 (Docket # 62 in 02 Cr. 348) 5-25.  Judge Leisure found that the conspiracy involved 120

kilograms of cocaine, which gave a base offense level of 36, and increased the offense level by 4 points to 40 based on his finding that Ortega was an "organizer or leader" of criminal activity involving five or more people under the United States Sentencing Guidelines ("U.S.S.G."). See Sentencing Hearing Transcript, filed June 30, 3005 (Docket # 79) ("S. Tr.") 39, 40, 43. The guidelines range for this level, with a criminal history category of III or IV, was 360 months to life. See Sentencing Table (annexed as Ex. K to Resp. App'x) ("Sentencing Table"). On June 2, 2005, Judge Leisure sentenced Ortega principally to 360 months' imprisonment followed by a period of ten years' supervised release. (S. Tr. 44).

      D.    <u>Direct Appeal</u>

On appeal, Ortega argued that his Sixth Amendment rights were violated by the admission, through the testimony of a cooperating witness, of an incriminating statement made by Parra, and that the District Court imposed an unreasonable sentence on him. See <u>United States v. Parra</u>, 249 F. App'x 226, 228 (2d Cir. 2007). On September 28, 2007, the Second Circuit rejected both of these claims. See <u>id.</u> Ortega did not file a petition for a writ of certiorari.

      E.    <u>The Instant Motion</u>

Ortega submitted the instant motion to vacate, set aside, or correct his sentence on December 24, 2008. See Pet. Mot. Ortega seeks relief on three main grounds: (1) that his trial counsel was ineffective for failing to advise him to proceed to a bench trial on stipulated facts; (2) he did not receive effective assistance of trial counsel with respect to his decision to go to trial rather than plead guilty; and (3) his trial counsel was ineffective due to the cumulative impact of various deficiencies or errors during the pretrial, plea, trial, sentencing, and direct

appeal process.  Id. at 4-7.[4]  The Government filed opposition papers on July 29, 2009, see

Memorandum of Law of the United States of America in Opposition to Defendant Jorge Gandia

Ortega's Motion Pursuant to 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct His Sentence,

filed July 29, 2009 (Docket # 88 in 02 Cr. 348); Resp. App'x.  On September 16, 2009, Ortega

filed reply papers.  See Movant's Renewed Motion for Discovery, filed Sept. 16, 2009 (Docket

# 92 in 02 Cr. 348); Pet. Supp. Ex.; Movant's Statement of Disputed Issues of Material Fact,

filed Sept. 16, 2009 (Docket # 94 in 02 Cr. 348); Movant's Traverse, filed Sept. 16, 2009

(Docket # 95 in 02 Cr. 348).  On October 1, 2010, the case was reassigned to Judge Laura Taylor

Swain, see Notice of Reassignment, filed Oct. 1, 2010 (Docket # 8), and was thereafter referred

to the undersigned, see Order of Reference to a Magistrate Judge, filed Nov. 10, 2010 (Docket

# 9).

      On June 13, 2011, this Court directed the Government to respond to the new factual

materials contained in petitioner's reply papers.  See Order, dated June 13, 2011 (Docket # 14).

Additionally, the Court directed the Government to obtain an affidavit from Ortega's defense

counsel, Larry Bronson.  See id.  In response to this order, the Government filed further reply

papers, see Memorandum of Law of the United States in Further Opposition to Jorge Gandia

Ortega's Motion to Vacate, Set Aside, or Correct His Sentence Pursuant to 28 U.S.C. § 2255,

filed Jan. 5, 2012 (Docket # 19), though it was unable to obtain an affidavit from Bronson.

      Ortega then submitted an additional brief, see Movant's Supplemental Reply to the

Government Reply to Traverse Issues, filed Jan. 31, 2012 (Docket # 21) ("Supp. Reply"), and a

---

    [4] Ortega's petition asserts a fourth claim in which Ortega states that his "conviction and
sentence are violative of the First, Fourth, Fifth, Sixth, and Eighth Amendments to the
Constitution."  Pet. Mot. at 7.  However, no facts or arguments are supplied in support of this
claim.  Thus, we do not address it further.

motion seeking further discovery, see Petitioner's Motion for Leave to Invoke Discovery and/or

Expand Records Pursuant to Rule 6 and 7 of the Habeas Corpus Proceedings, Under the Federal

Rules of Criminal and Civil Procedure, filed Apr. 12, 2012 (Docket # 105 in 02 Cr. 348)

("Discovery Mot.").

II.     LAW GOVERNING PETITIONS UNDER 28 U.S.C. § 2255

        28 U.S.C. § 2255 provides:

> A prisoner in custody under sentence of a court established by Act of
> Congress claiming the right to be released upon the ground that the
> sentence was imposed in violation of the Constitution or laws of the
> United States, or that the court was without jurisdiction to impose such
> sentence, or that the sentence was in excess of the maximum authorized
> by law, or is otherwise subject to collateral attack, may move the court
> which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255(a).  Relief under § 2255 is available "only for a constitutional error, a lack of

jurisdiction in the sentencing court, or an error of law or fact that constitutes a fundamental defect

which inherently results in [a] complete miscarriage of justice."  Graziano v. United States, 83

F.3d 587, 590 (2d Cir. 1996) (per curiam) (internal quotation marks and citation omitted).

"Because collateral challenges are in tension with society's strong interest in the finality of

criminal convictions, the courts have established rules that make it more difficult for a defendant

to upset a conviction by collateral, as opposed to direct, attack."  Yick Man Mui v. United States,

614 F.3d 50, 53 (2d Cir. 2010) (internal quotation marks and citation omitted).

        In considering a § 2255 petition, "[u]nless the motion and the files and records of the case

conclusively show that the prisoner is entitled to no relief, the court shall . . . grant a prompt

hearing thereon, determine the issues and make findings of fact and conclusions of law with

respect thereto."  28 U.S.C. § 2255(b).  On the other hand, if it "plainly appears from the motion,

any attached exhibits, and the record of prior proceedings that the moving party is not entitled to

relief, the judge must dismiss the motion." Puglisi v. United States, 586 F.3d 209, 213 (2d Cir. 2009) (internal quotation marks and citations omitted).

Case law reflects that a hearing is required in § 2255 cases "where the petitioner has made a plausible claim." Morales v. United States, 635 F.3d 39, 45 (2d Cir. 2011) (addressing ineffective assistance of counsel claims) (citing Puglisi, 586 F.3d at 213) (quotation marks omitted). To warrant a hearing, a petitioner's "application must contain assertions of fact that [the] petitioner is in a position to establish by competent evidence." United States v. Aiello, 814 F.2d 109, 113 (2d Cir. 1987); see also LoCascio v. United States, 395 F.3d 51, 57 (2d Cir. 2005) ("mere generalities or hearsay statements will not normally entitle the applicant to a hearing, since such hearsay would be inadmissible at the hearing itself") (internal quotation marks, punctuation, and citations omitted). The court must determine whether, viewing the record "in the light most favorable to the petitioner, the petitioner, who has the burden, may be able to establish at a hearing a prima facie case for relief." Puglisi, 586 F.3d at 213. If any material facts are in dispute and a petitioner can identify the available sources of the relevant evidence, a petitioner's claims will warrant a hearing. See id. at 213-14 (noting that "a petitioner may need only to identify available sources of relevant evidence rather than obtain it as in civil cases"). Nonetheless, "[a]iry generalities, conclusory assertions and hearsay statements will not suffice because none of these would be admissible evidence at a hearing." Aiello, 814 F.2d at 113-14. Furthermore, the Court is not required to presume the credibility of factual assertions "where the assertions are contradicted by the record in the underlying proceeding." Puglisi, 586 F.3d at 214.

However, even when a hearing is required, "'the statute itself recognizes that there are times when allegations of facts outside the record can be fully investigated without requiring the personal presence of the prisoner.'" Chang v. United States, 250 F.3d 79, 85 (2d Cir. 2001)

(quoting <u>Machibroda v. United States</u>, 368 U.S. 487, 495 (1962)); <u>see</u> 28 U.S.C. § 2255(c) ("A court may entertain and determine such motion without requiring the production of the prisoner at the hearing.").  Depending on the allegations in the petition, a "court may use methods under Section 2255 to expand the record without conducting a full-blown testimonial hearing."  <u>Chang</u>, 250 F.3d at 86 (citing <u>Blackledge v. Allison</u>, 431 U.S. 63, 81-82 (1977)).  Potential methods available to a court to supplement the record include "'letters, documentary evidence, and, in an appropriate case, even affidavits.'"  <u>Id.</u> (quoting <u>Raines v. United States</u>, 423 F.2d 526, 529-30 (4th Cir. 1970)); <u>accord</u> <u>Pham v. United States</u>, 317 F.3d 178, 184 (2d Cir. 2003) (although court should not summarily dismiss a petition where factual issues exist, the Second Circuit "permits a middle road of deciding disputed facts on the basis of written submissions") (internal quotation marks and citation omitted).

A full testimonial hearing should be conducted if it would "offer any reasonable chance of altering [the court's] view of the facts."  <u>Chang</u>, 250 F.3d at 86.  A petitioner's statement is "sufficiently credible to warrant a hearing where it is accompanied by some 'objective evidence.'"  <u>Puglisi</u>, 586 F.3d at 216; <u>accord</u> <u>Boakye v. United States,</u> 2010 WL 1645055, at *6 (S.D.N.Y. Apr. 22, 2010) ("To obtain an evidentiary hearing, Petitioner must . . . set forth in an affidavit specific facts supported by competent evidence, raising detailed and controverted issues of fact which, if proved at a hearing, would entitle him to relief.") (citations omitted); <u>Petrucelli v. United States</u>, 2009 WL 4858081, at *13 n.1 (S.D.N.Y. Dec. 15, 2009) ("To warrant an evidentiary hearing, a habeas petitioner must raise detailed and controverted issues of fact supported by competent evidence.").  Case law makes clear that a testimonial hearing need not take place if it would not succeed in providing additional material facts.  <u>See</u>, <u>e.g.</u>, <u>Fermin v. United States</u>, 2012 WL 1632696, at *9 (S.D.N.Y. May 4, 2012) (petitioner's "failure to provide

specific facts about any conversations to support his claim suggests that a testimonial hearing would do nothing to reveal such facts").

"It is within the district court's discretion to determine the scope and nature of a hearing." Raysor v. United States, 647 F.3d 491, 494 (2d Cir. 2011); accord Campusano v. United States, 442 F.3d 770, 776 (2d Cir. 2006).

III.     LAW GOVERNING INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS

"In order to prove ineffective assistance, [a petitioner] must show (1) 'that counsel's representation fell below an objective standard of reasonableness;' and (2) 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" Pham, 317 F.3d at 182 (quoting Strickland v. Washington, 466 U.S. 668, 688, 694 (1984)); accord United States v. Brown, 623 F.3d 104, 112 (2d Cir. 2010); see also Massaro v. United States, 538 U.S. 500, 505 (2003) ("[A] defendant claiming ineffective counsel must show that counsel's actions were not supported by a reasonable strategy and that the error was prejudicial.").

In evaluating the first prong – whether counsel's performance fell below an objective standard of reasonableness – "'[j]udicial scrutiny . . . must be highly deferential'" and the petitioner must overcome the "'presumption that, under the circumstances, the challenged action might be considered sound trial strategy.'" Bell v. Cone, 535 U.S. 685, 698 (2002) (quoting Strickland, 466 U.S. at 689) (additional quotation marks and citation omitted); see Dunham v. Travis, 313 F.3d 724, 730 (2d Cir. 2002) (according counsel a presumption of competence). Concerning the second prong – whether there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different – the Second Circuit generally "requires some objective evidence other than defendant's assertions to establish

15

prejudice." Pham, 317 F.3d at 182 (citing United States v. Gordon, 156 F.3d 376, 380-81 (2d Cir. 1998) (per curiam)).

IV.    DISCUSSION

Ortega's petition raises three claims of ineffective assistance of counsel.  He asserts that his trial counsel was ineffective for failing to advise him to proceed to a bench trial on stipulated facts, Pet. Mot. at 4; that he received ineffective assistance with respect to his decision to plead not guilty and go to trial, id. at 5; and that his trial counsel was ineffective due to the cumulative impact of various deficiencies or errors during the pretrial, plea, trial, sentencing, and direct appeal process, id. at 6.  Each of these claims is addressed in turn.

A.    Failure to Advise Ortega to Proceed to a Bench Trial

Ortega argues that his counsel was ineffective for failing to advise him to proceed to a bench trial on stipulated facts.  See Pet. Mot. at 4-5, 43-53.  But Ortega has not demonstrated either that his counsel's failure to seek a bench trial fell below an objective standard of reasonableness, or that there was a reasonable probability that, but for counsel's failure, the result of the proceeding would have been different.

First, Ortega has not overcome the presumption that, under the circumstances, the decision to proceed before a jury was sound trial strategy.  See Bell, 535 U.S. at 698 ("[D]efendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.") (internal quotation marks and citations omitted); Dunham, 313 F.3d at 730 ("[T]he reviewing court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.") (internal quotation marks and citation omitted).  "[T]here is no federal constitutional right to a bench trial," and thus trial counsel's failure to advise Ortega to proceed to a bench trial does not constitute a per se violation

16

of his constitutional rights.  Francolino v. Kuhlman, 365 F.3d 137, 142 (2d Cir. 2004).

Additionally, Ortega has provided no grounds for believing that counsel acted ineffectively

because there is no basis for concluding that in this case, where Ortega's strategy was to contest

his guilt and the weight of the evidence presented against him, reasonable counsel would have

sought a bench trial.  See United States v. Quiroz-Medez, 2010 WL 3419812, at *3 (D. Mont.

Aug. 27, 2010) ("A bench trial is not viable as a means for contesting factual guilt and

'preserv[ing] issues that do not relate to factual guilt.'") (quoting U.S.S.G. § 3E1.1 Application

Note 2).  Thus, Ortega has not demonstrated that it was objectively unreasonable for his counsel

to not seek a bench trial.

Moreover, Ortega cannot meet the second prong of the Strickland test: that is, he has not

demonstrated that there is a reasonable probability that, had counsel sought a bench trial, the

result of the proceeding would have been different.  First, the decision to waive the jury trial is

governed by Rule 23(a) of the Federal Rules of Criminal Procedure, which requires not only the

defendant's waiver, but also the Government's consent and the court's approval.  It is pure

speculation to assume that the Government or the Court would have approved the waiver.

Second, there is no reason to believe that the outcome of the trial – that is, the determination that

Ortega was guilty of both counts of the indictment – would have been any different had the case

been tried to a judge, rather than jury.

Ortega's main concern seems to be his view that his sentence would have been affected by

having been convicted at a bench trial rather than a jury trial.  He argues that had he been

convicted at a bench trial he would have been entitled to a reduction in his offense level under

U.S.S.G. § 3E1.1.  See Pet. Mot. at 18 ¶ 65.  But this section provides for reduction of a convicted

defendant's offense level, only "if the defendant clearly demonstrates acceptance of responsibility

for his offense." U.S.S.G. § 3E1.1(a).  Obviously, pursuing a bench trial does not demonstrate any acceptance of responsibility.

Ortega's argument seems to turn on his insistence that he would have "stipulated" to facts at a bench trial.  Pet. Mot. at 18 ¶¶ 65, 66.  But he does not state what facts he would have stipulated to.  Moreover, comment 2 to USSG § 3E1.1 states that, "this adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse."  It is true that the Guidelines allow for "rare situations" where the defendant accepts responsibility even though he proceeds to trial.  Id.  But Ortega does not explain why this would be such a situation.  Comment 2 states that such a situation may occur where "a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (e.g., to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct)."  Id.; see also United States v. Villasenor-Cesar, 114 F.3d 970, 972-73 (9th Cir. 1997) (two-level downward adjustment affirmed where defendant's arguments at the bench trial were "all of a legal nature"); United States v. Ryan, 964 F. Supp. 526, 533 (D. Mass. 1997) (defendant entitled to a deduction of two levels on the grounds of acceptance of responsibility where defendant "stipulated to the facts underlying the contempt offense and exercised his right to trial solely for the purpose of raising an important double jeopardy issue").  Ortega has not suggested that had a reason to preserve only issues that did not relate to factual guilt.

Ortega suggests that he would have stipulated to certain facts and raised the issue of "sufficiency of the evidence." Pet. Mot. at 18 ¶ 65.  But in Ortega's case, this would be tantamount to a decision to plead guilty since there was obviously no claim that the evidence presented at trial was in any way insufficient to prove his guilt.  See id. at 8 ¶ 7 ("[a]t trial, the

evidence presented by the government was overwhelming").  If the facts he would have stipulated to were the elements of the crime against him, then he could have simply pled guilty. Accordingly, there is no reason to believe that a bench trial would have had any effect on his sentence.

For these reasons, Ortega's claim that counsel was ineffective in failing to seek a bench trial should be denied

B.       Plea Negotiations and Decision to Go to Trial

Ortega argues that his trial counsel's handling of plea negotiations was constitutionally ineffective.  See Pet. Mot. at 56-77.  "During plea negotiations defendants are 'entitled to the effective assistance of competent counsel.'"  Lafler v. Cooper, 132 S.Ct. 1376, 1384 (2012) (quoting McMann v. Richardson, 397 U.S. 759, 771 (1970)); accord Purdy v. United States, 208 F.3d 41, 44-45 (2d Cir. 2000) ("[D]efense counsel 'must give the client the benefit of counsel's professional advice on th[e] crucial decision' of whether to plead guilty.") (quoting Boria v. Keane, 99 F.3d 492, 497 (2d Cir. 1996)) (additional internal quotation marks and citations omitted)).  Thus, "defense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused." Missouri v. Frye, 132 S. Ct. 1399, 1408 (2012).

"If a plea bargain has been offered, a defendant has the right to effective assistance of counsel in considering whether to accept it."  Lafler, 132 S. Ct. at 1387.  "As part of this advice, counsel must communicate to the defendant the terms of the plea offer, and should usually inform the defendant of the strengths and weaknesses of the case against him, as well as the alternative sentences to which he will most likely be exposed."  Purdy, 208 F.3d at 45 (citations omitted). However, the "ultimate decision whether to plead guilty must be made by the defendant," and "a

19

lawyer must take care not to coerce a client into either accepting or rejecting a plea offer." Id. The Second Circuit has held that "[c]ounsel rendering advice in this critical area may take into account, among other factors, the defendant's chances of prevailing at trial, the likely disparity in sentencing after a full trial as compared to a guilty plea (whether or not accompanied by an agreement with the government), whether the defendant has maintained his innocence, and the defendant's comprehension of the various factors that will inform his plea decision." Id.

We divide Ortega's claim into two periods: the time prior to Koppelman's representation and the time afterwards.  Each is discussed separately.

1.    Period Prior to Koppelman's Representation

Prior to May 2003, Ortega claims that he received ineffective assistance from Bronson with respect to his decision to plead guilty.  See Pet. Mot. at 12 ¶ 28.  Notably, Ortega makes no claim that any plea offer was made by the Government during this period.  Nor does the record suggest that any such plea offer was made.  During this period, his plea would have been what is commonly called a "straight up" plea – that is, a plea to the full indictment without a plea agreement.

While Ortega had originally asserted that he told his attorneys that he wished to plead guilty on "3 different occasions," id. at 12 ¶ 33, no dates are given for these conversations; nor does Ortega identify with which attorney he had these conversations.  Moreover, his later declaration makes clear that he was merely "considering" whether to plead guilty – not that he had instructed any particular attorney to arrange a guilty plea.  See, e.g., Ortega Decl. ¶ 8.  In any event, Ortega at no time states that he informed Bronson that he wished to plead guilty and that Bronson failed to make arrangements for the plea to take place.  Rather, he states that Bronson persuaded him not to plead guilty, and that this resulted because of Bronson's improper advice.

20

See id. ¶ 3.

Of course, an attorney's advice to a client to go to trial – even in the face of a later conviction – does not by itself reflect that an attorney has been ineffective.  See generally United States v. Millan, 22 Fed. App'x 35, 36 (2d Cir. 2001) (summary order) ("trial counsel's advice to proceed to trial rather than to plead guilty was at the time strategically valid, even if ultimately unsuccessful").  Here, Ortega faults Bronson's advice on two points: Bronson's estimation of the strength of the Government's case, see, e.g., Ortega Decl. ¶ 3, and Bronson's advice regarding the sentence Ortega would face based on a guilty plea as opposed to the sentence he would face following conviction at trial, id. ¶ 4.  But neither of the descriptions given by Ortega of this advice meet his burden of showing ineffective assistance.

As to the strength of the Government's case, Ortega says that Bronson told him that the Government had no wiretap evidence and one witness.  Id. ¶ 3.  Nothing in the record suggests that this description of the Government's case was incorrect at the time Bronson gave it, however.  Ortega also alleges that Bronson told him there was no "physical evidence," but this statement is ambiguous.  Id.  It is not repeated in Bronson's letter on the topic and it is unclear what Ortega contends he was told.  It is certainly true that no physical evidence was recovered from Ortega personally and thus it is accurate in that sense.  In other words, any effort to tie Ortega directly to the 20 kilograms seized from the apartment could only be made through witness testimony.

As for the sentencing exposure, "it is objectively unreasonable for defense counsel advising the defendant on a plea offer to 'grossly underestimat[e] [the defendant's] sentencing exposure' in the event of a guilty verdict at trial."  Watson v. United States, 307 F. App'x 524, 525 (2d Cir. 2009) (summary order) (quoting United States v. Gordon, 156 F. 3d 376, 380 (2d Cir. 1998)) (alterations in original); Carrion v. Smith, 365 F. App'x 278, 282 (2d Cir. 2010)

(summary order) (claim cannot be rejected under <u>Strickland</u> if "(1) defense counsel failed to advise [defendant] of his sentencing exposure if convicted at trial, and (2) had [defendant] known of his sentencing exposure, he would have accepted the plea deal.").  Here, of course, there was no plea being offered, so it is not even clear under case law that Bronson had any obligation to inform Ortega at this very early stage of the case of the benefits of a "straight up plea" versus the risks of going to trial.  In any event, Bronson accurately estimated Ortega's sentencing exposure based on the information available to him at the time.  Bronson assumed an offense level of 34 – a reasonable assumption in light of the fact that he had been told by the Government that the offenses involved 20 kilograms of cocaine.  <u>See</u> Bronson Ltr.  Bronson accurately stated the sentencing exposure following trial at this level as 168 to 210 months, and the exposure that Ortega would face if he pled as 121 to 151 months.  <u>See</u> Ortega Decl. ¶ 9.[5]  Ortega focuses on the fact that Bronson compared the upper value of the plea range (151) with the lower value of the sentence-after-trial-conviction range (168) months to conclude that he faced only an additional 17 months if he went to trial.  <u>See</u> Ortega Decl. ¶¶ 4, 9.  But Ortega admits that Bronson accurately advised him of the two ranges involved.  <u>See</u> <u>id.</u> ¶ 9.  Ortega also concedes that Bronson informed him that his "statutory sentencing exposure was ten-to-forty years."  <u>Id.</u>

_____

[5] Bronson assumed a Criminal History Category of II.  <u>See</u> Sentencing Table.  While Ortega was ultimately found to have a Criminal History Category of IV based on out-of-state convictions, knowledge of these convictions eluded the Government until January 2004, <u>see</u> Jan. 21 Email, and their existence was still being disputed at the sentencing hearing (S. Tr. 6) (suggesting that the Puerto Rico conviction was for a different person named Ortega).  There is nothing in the record to suggest that Bronson was ineffective for not having been aware of convictions that the Government itself was unaware of.  Notably, Ortega recounts nothing of what he told his own attorneys regarding his criminal history.  In any event, any increase in the Criminal History level would not only have made the potential sentence after trial higher, it would also have made his potential sentence with a "straight up" plea higher.  Thus, because there was no plea offer, Ortega would have to compare a higher post-trial sentence with the higher sentence that would result from a plea to the indictment.

Based on the Court's review of this record, the Court concludes that Bronson's advice, even if not ideal in its presentation, was sufficient to allow Ortega to compare the likely sentencing exposure he faced if he went to trial compared with the likely sentencing exposure he faced if he pled without an agreement.

Notably, in the event it was found that Koppelman acted effectively with respect to his representation of Ortega, Bronson's alleged failings would become irrelevant. This is because a straight up plea would have also been available during the period Koppelman represented Ortega. Additionally, any alleged failing by Bronson did not cause Ortega prejudice because Ortega was later offered a plea on terms essentially identical to the "straight up" plea allegedly considered by Ortega while he was represented by Bronson. At the December 2003 reverse proffer session, Ortega was offered a plea, subject to approval, under which the relevant conduct would involve 20 kilograms of cocaine – precisely what Bronson had assumed. While the Government's offer was characterized as being for "135-168 months," see Gov't Notes, the difference between this offer and Bronson's description of the guidelines sentence that would result from a "straight up" plea is attributable to the fact that the Government viewed Ortega has having a criminal history of III, rather than II. See id. But there is no reason to believe that had Ortega made a "straight up" plea while he was being represented by Bronson that the Government would have asserted that Ortega was in a criminal history category of II (as Bronson assumed) rather than III. The information about Ortega's criminal history was available to the Government, pre-trial services and the Court upon investigation.

Accordingly, we conclude that Ortega's ineffective assistance claim as to Bronson fails.[6]

_____

[6] Ortega also claims that "counsel" – apparently Bronson – labored under an actual conflict of interest. Pet. Mot. at 22 ¶ 86; see also Discovery Mot. at 2. But to prevail on such a claim, Ortega is obligated to show some "plausible alternative defense strategy not taken up by

2.      Period After Koppelman's Representation

As noted, Koppelman first appeared in district court on this case on May 15, 2003, though Ortega estimates that he met with him in person in "April or May of 2003." Ortega Decl. ¶ 11. Ortega makes various complaints about Koppelman's representation, in particular claims that Koppelman (1) misadvised him as to the strength of the Government's case, see id. ¶¶ 12-14, 16; (2) misadvised him as to the penalties he faced after trial, see Pet. Mot. at 13 ¶¶ 36, 37; (3) failed to inform him of certain advantages associated with pleading guilty, see id. at 14 ¶¶ 41, 42; and (4) failed to adequately investigate facts and case law so that Ortega could make an informed decision, see id. at 11 ¶ 21, 15 ¶¶ 45-47.[7]

The Court believes that it may benefit from a hearing under which testimony can be heard from Ortega, Koppelman, AUSA Kim, and any other witnesses, which might be more detailed than the affidavits previously provided to the Court.  For example, the Court may benefit from hearing evidence as to whether Koppelman told Ortega that "Gonzalez was the only witness the government had to use against [him]" and any statements he made about the strength of the

_____

counsel." LoCascio, 395 F.3d at 56 (internal quotation marks and citation omitted). Additionally, he must show "causation – i.e., [the fact] that the alternative defense was inherently in conflict with or not undertaken [due to] the attorney's other loyalties or interests." Id. (internal quotations marks and citation omitted). Here, Ortega points to no alternative defense strategy that Bronson should have pursued.  A fortiori he has not shown that the strategy was in conflict with or not undertaken due to Bronson's allegedly conflicting interests.

[7] In his original papers Ortega made a claim that "on [three] different occasions, [he] timely advised counsel he wanted to plead guilty to plea agreements offered by the government." Pet. Mot. at 12 ¶ 33.  Ortega fails to explain when this happened and which of his attorneys he so "advised."  More importantly, this claim was contradicted by Ortega's supplemental papers in which he states that it was his "intention and desire" to accept a plea bargain, but that he ultimately decided not to accept it because of his counsel's advice concerning the strength of the Government's case and potential exposure after trial.  See Ortega Decl. ¶¶ 15, 16. As Ortega does not offer any specifics regarding this claim and contradicts it in his reply papers, we deem withdrawn any claim that counsel did not permit him to plead guilty.

24

Government's case, Ortega Decl. ¶¶ 12, 14, and whether Koppelman repeated Bronson's
assertion even after the reverse proffer session that a conviction would only risk an additional 17
months on his sentence, id. ¶ 14.  Also, it may be that, despite their statements regarding their
recollections of this case in their affidavits, the recollections of either Koppelman or Kim could
be refreshed if they were to see certain documents from the case that the Government or
Koppelman might be able to retrieve – such as the discovery provided to the attorneys by the
Government – or that they had not seen at the time they prepared their affidavits.  Their
recollections might also be refreshed if they were to see Ortega and hear the specifics of his
testimony.

The Court notes that, in addition to showing that his counsel's performance was
ineffective, Ortega must show that he was prejudiced by his counsel's shortcomings.  Assuming
Ortega could show he would have accepted the plea, the Supreme Court has recently made clear
that the petitioner must also show that the prosecutor would not have withdrawn or canceled any
plea offer, see Frye, 132 S. Ct. at 1409, and "that the court would have accepted its terms," Lafler,
132 S. Ct. at 1385.  It may be of use to amplify the record on some or all of these points as well.

Accordingly, a testimonial hearing will be ordered as to this aspect of Ortega's claim.

C.      Conduct During Pretrial, Trial, Sentencing and Direct Appeal

Ortega makes a claim that his trial counsel was ineffective due to the cumulative impact
of certain deficiencies or errors during the pretrial, plea, trial, sentencing, and direct appeal
process.  See Pet. Mot. at 33-42, 54-55.  In this claim, Ortega simply lists a number of claims
without elaboration, asserting inter alia that defense counsel failed to move to suppress evidence
at trial and sentencing, id. at 8 ¶ 5, 21 ¶ 82; failed to investigate or present available evidence and
legal authority at the sentencing of Ortega, id. at 21 ¶ 83; failed to object to "unlawful, false, and

unreliable evidence" used to determine Ortega's guideline sentencing range and ultimate sentence, id.; failed to move for a downward departure or a downward variance under 18 U.S.C. § 3553(a), id. at 21-22 ¶ 84; failed to "investigate or present the strongest issues available to . . . Ortega for his direct appeal and failed to preserve viable issues for collateral review," id. at 22 ¶ 85; and failed to timely move for dismissal of the indictment, id. at 21 ¶ 82.

Ortega's petition provides no further information on the nature of these claims. See id. at 54-55. Accordingly, they fail because they are conclusory and unsupported by any explanation or evidence. See, e.g., Tineo v. United States, 977 F. Supp. 245, 259 (S.D.N.Y. 1996) ("vague and conclusory allegations preclude the Court from identifying any alleged errors which might have prejudiced Petitioner") (citation omitted) (emphasis in original). Matura v. United States, 875 F. Supp. 235, 237 (S.D.N.Y. 1995) ("[a] mere conclusory allegation is insufficient to substantiate a § 2255 motion"). For example, to show ineffective assistance for the failure to make a suppression motion, "the underlying motion must be shown to be meritorious, and there must be a reasonable probability that the verdict would have been different if the evidence had been suppressed." United States v. Matos, 905 F.2d 30, 32 (2d Cir. 1990) (citing Kimmelman v. Morrison, 477 U.S. 365, 375-76 (1986)). Here, Ortega does not specify what evidence counsel should have moved to suppress. Nor does he assert that he was prejudiced by any such failure.

Similarly, Ortega fails to support with any specific claims or arguments his assertion that counsel acted unprofessionally with respect to his sentencing. Notably, the record reflects that Koppelman argued, with case law support, that the Government had failed to establish the existence of a prior felony conviction (S. Tr. 5-6, 11-14), and provided information regarding the negative impact of Ortega's incarceration on his family (S. Tr. 15-16). Koppelman also objected to both the quantity of drugs for which the Government wanted to hold Ortega accountable (S. Tr.

15-16), and the district court's consideration of Rosario's testimony at the <u>Fatico</u> hearing (S. Tr. 15-16, 23-26).

As to Ortega's argument that his counsel's failure to move for a downward departure of his sentence constituted ineffective assistance, Ortega fails to point to specific facts or provisions relating to downward departure in the sentencing guidelines that counsel should have raised, why it was improper not to raise them, and why raising them would have resulted in a different sentence.  <u>See</u> <u>generally</u> <u>Aparicio v. Artuz</u>, 269 F.3d 78, 99 (2d Cir. 2001) ("The failure to include a meritless argument does not fall outside the wide range of professionally competent assistance to which Petitioner was entitled.") (internal quotation marks omitted).  Notably, counsel made a number of arguments at sentencing in an effort to reduce Ortega's sentence, including arguments that the court should not impose the mandatory minimum sentence and that Ortega's base offense level was 34 without an enhancement, not 38 as stated by probation.  (S. Tr. 4, 18-19, 28).

Ortega's argument that his counsel failed to investigate or present the strongest issues available to Ortega for his direct appeal and failed to preserve viable issues for collateral review does not specify what arguments were not raised or what arguments should have been preserved, let alone explain why any such arguments would have been successful.  Accordingly, this argument is rejected.  <u>See</u> <u>United States v. Morel</u>, 2010 WL 2900318, at *6 (S.D.N.Y. July 22, 2010) ("To the extent that the defendant argues that this error was prejudicial, he does not specify what better arguments were not raised or what argument should have been preserved."); <u>Benoit v. United States</u>, 2010 WL 3925201, at *20 (E.D.N.Y. Feb. 25, 2010) (defendant failed to meet his "burden of proof" because he did not "state what 'strongest issues' the appellate counsel did not 'investigate or present' and what 'viable issues' were not preserved for collateral review").

As to Ortega's argument that his attorney failed to timely move for dismissal of the

27

indictment, Ortega does not explain why any such motion would have had merit.  An indictment

cannot be challenged merely on the ground that it is not supported by adequate or competent

evidence, see, e.g., Costello v. United States, 350 U.S. 359, 363 (1956); United States v. Alfonso,

143 F.3d 772, 776 (2d Cir. 1998), and the dismissal of an indictment is warranted only in

exceptional circumstances, see, e.g., United States v. Brown, 602 F.2d 1073, 1077 (2d Cir.) ("We

have approved [the] extreme sanction [of dismissal of the indictment] only when the pattern of

[prosecutorial] misconduct is widespread or continuous."), cert. denied, 444 U.S. 952 (1979),

which are not alleged by Ortega.

Finally, Ortega's argument that he is entitled to relief because of the "cumulative impact

of multiple deficiencies or errors by counsel during the pretrial, plea, trial, sentencing, and appeal

process" fails because Ortega has not established any deficiency.  See, e.g., United States v. Wu,

2009 WL 3053741, at *4 n.4 (S.D.N.Y. Sept. 17, 2009) ("Since none of [petitioner's] claims has

the slightest merit, his [cumulative impact] claim . . . adds nothing to his argument."); Porter v.

United States, 2008 WL 5451011, at *1 n.1 (E.D.N.Y. Dec. 31, 2008) ("because petitioner has

failed to establish that there were, in fact, errors at trial . . . petitioner's 'cumulative effect'

arguments have no basis in fact and fail as a matter of law").

Accordingly, to the extent Ortega seeks a testimonial hearing to support this aspect of his

habeas petition, the request is denied because Ortega has not shown he is entitled to relief based

on any of these grounds.

V.    CONCLUSION

For the foregoing reasons, Ortega's petition should be denied in its entirety, with the

exception of Ortega's claim that he received effective assistance of counsel with respect to his

decision to go to trial rather than to plead guilty during the period that he was represented by

28

Robert Koppelman.  By separate Order, Ortega will be appointed counsel for the purpose of eliciting evidence relating to this claim at a testimonial hearing.

## PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days including weekends and holidays from service of this Report and Recommendation to serve and file any objections.  See also Fed. R. Civ. P. 6(a), (b), (d). Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with copies sent to the Hon. Laura T. Swain, and to the undersigned, at 500 Pearl Street, New York, New York 10007.  Any request for an extension of time to file objections must be directed to Judge Swain.  If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal.  See Thomas v. Arn, 474 U.S. 140 (1985); Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C., 596 F.3d 84, 92 (2d Cir. 2010).

Dated: June 27, 2012
         New York, New York

_____
GABRIEL W. GORENSTEIN
United States Magistrate Judge

Copies sent to:

Jorge Gandia Ortega
44943-054
FCC-USP-1
P.O. Box 1033
Coleman, FL 33521

James J. Pastore , Jr
United States Attorney's Office
Southern District of New York
One St. Andrew's Plaza
New York, NY 10007

Robert Koppelman.  By separate Order, Ortega will be appointed counsel for the purpose of eliciting evidence relating to this claim at a testimonial hearing.

## PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days including weekends and holidays from service of this Report and Recommendation to serve and file any objections.  See also Fed. R. Civ. P. 6(a), (b), (d). Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with copies sent to the Hon. Laura T. Swain, and to the undersigned, at 500 Pearl Street, New York, New York 10007.  Any request for an extension of time to file objections must be directed to Judge Swain.  If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal.  See Thomas v. Arn, 474 U.S. 140 (1985); Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C., 596 F.3d 84, 92 (2d Cir. 2010).

Dated: June 27, 2012
       New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge

29